James M. Harrington, *pro hac vice* application pending
jharrington@harringtonlawpc.com
HARRINGTON LAW, P.C.
P.O. Box 403
Concord, NC 28026-0403
Tel.: (704) 315-5800 / Fax: (704) 625-9259
*Attorney for Plaintiff*
SLEP-TONE ENTERTAINMENT CORPORATION

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Slep-Tone Entertainment Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Donald Kugel; Wired for Sound Karaoke and DJ Services LLC; Ernest Z. McCullar; Kristina Moss; Thomas Shearer; Mark Sherman; Heather McCall; Brenda L. Jensen; Michael Roundtree; Darrell D. Erlandson; U.R. Entertainment, Inc.; Dennis O'Neal; Wet Dog Promotions Entertainment LLC; and Kriston T. Wist,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, hereby complains of the Defendants, and for its complaint alleges as follows:

## **SUMMARY**

1. This is an action for trademark infringement, trade dress infringement, and federal unfair competition, brought by the Plaintiff against the Defendants, in which the Defendants are accused of committing piracy of and counterfeiting karaoke accompaniment tracks comprising trademarks and trade dress belonging to the Plaintiff.

2. The Defendants are specifically accused of making, acquiring, using, and in some cases selling and distributing unauthorized counterfeit duplicates of karaoke accompaniment tracks that have been marked with the Plaintiff's registered trademarks, and/or that exhibit the Plaintiff's proprietary and distinctive trade dress, and that have been marked with other manufacturers' words, names, and symbols, and deriving commercial benefit therefrom.

## JURISDICTION AND VENUE

3. This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4. This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the Plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the defendants reside in this State and judicial district.

6. This Court has personal jurisdiction over each of the Defendants, in that each of them resides in this State and judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and judicial district.

## THE PLAINTIFF

7. Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Charlotte, North Carolina.

## THE DEFENDANTS

8. Each of the Defendants is engaged in the operation of a commercial karaoke business, at least one principal aim of which is to provide karaoke-related services in exchange for money, on a bartered basis, or both.

9. Defendant Donald Kugel ("Kugel") is an individual who operates a commercial karaoke business under the trade name "Donk's Karaoke."

10. Defendant Wired for Sound Karaoke and DJ Services LLC ("Wired") is an Arizona limited liability company that operates a commercial karaoke business under its own name.

11. Defendant Ernest Z. McCullar ("McCullar") is an individual who is the principal moving spirit of Wired and who operates, through Wired, a commercial karaoke business.

12. Defendant Kristina Moss ("Moss") is an individual who operates a commercial karaoke business under the trade name "Spectacular Entertainment."

13. Defendant Thomas Shearer ("Shearer") is an individual who operates a commercial karaoke business under the trade name "Dark Desert Productions."

14. Defendant Mark Sherman ("Sherman") is an individual who operates a commercial karaoke business under the trade name "AllStar Entertainment."

15. Defendant Heather McCall ("McCall") is an individual who operates a commercial karaoke business under the trade name "No Cover Entertainment."

16. Defendant Brenda L. Jensen ("Jensen"), formerly known as Brenda Paquette, is an individual who operates a commercial karaoke business under the trade name "Elite Entertainment of Arizona."

17. Defendant Michael Roundtree ("Roundtree") is an individual who operates a commercial karaoke business in connection with Defendant Jensen.

18. Defendant Darrell D. Erlandson ("Erlandson") is an individual who owns a commercial karaoke business that operates under the trade name "Sensational Sound."

19. Defendant U.R. Entertainment, Inc. ("UR") is an Arizona corporation that operates a commercial karaoke business under its own name.

20. Defendant Dennis O'Neal ("O'Neal") is an individual who operates a commercial karaoke business under the trade name "Traffic Jam Entertainment."

21. Defendant Wet Dog Promotions Entertainment LLC ("Wet Dog") is an Arizona limited liability company that operates a commercial karaoke business under its own name.

22. Defendant Kriston T. Wist ("Wist") is an individual who operates a commercial karaoke business under the trade name "T-Dub Sound Productions."

## BACKGROUND FACTS

23. Karaoke entertainment is a multi-million dollar business in the United States. The premise of karaoke entertainment is that participants sing along to prerecorded popular-music accompaniment tracks consisting of instrumental and vocal backing and a synchronized display of lyrics.

24. The manufacturing process for karaoke accompaniment tracks involves re-recording popular songs in the style of a particular performer, but without the lead vocals, and synchronizing the music to a display of the lyrics in a manner that gives cues to the performer as to what and when to sing.

25. Plaintiff Slep-Tone is one of the leading U.S. manufacturers of karaoke accompaniment tracks.

26. Slep-Tone sells or licenses its accompaniment tracks for commercial use only on compact discs, primarily in one of two formats known as "CD+G" and "MP3+G." The "G" in each format name refers to the encoding of the recording with graphical data to provide a synchronized video display of the lyrics to the song.

///

///

HARRINGTON LAW, P.C.
Post Office Box 403
Concord, North Carolina 28026
704-315-5800 | fax 704-625-9259

27. The graphics data is also utilized to mark the accompaniment tracks with Slep-Tone's trademarks and to cause the trademarks to be displayed upon playback.

28. The graphics data also causes Slep-Tone's distinctive trade dress, comprising the non-functional elements of changing-color lyrics, singing cues, the particular typeface and layout of the lyrics, and logos and other graphical elements, to be displayed.

29. Slep-Tone physically marks its original storage media and associated packaging with its trademarks.

30. Slep-Tone caters a substantial portion of its business to professional providers of karaoke entertainment services, who are known in the industry as "karaoke jockeys" or "KJs." Those terms are analogous to the more familiar terms "disc jockey" and "DJ"). KJs are also referred to as "karaoke operators" or "karaoke hosts."

31. Karaoke operators, including the Defendants, use karaoke accompaniment tracks, together with additional equipment, to provide karaoke services to their customers and patrons in exchange for compensation that may include financial payments, barter goods (such as free food and beverages), and tips.

32. A karaoke operator's customers typically include public-access establishments such as bars, restaurants, and social clubs; promoters of festivals and other public gatherings; and organizers of private parties such as weddings, reunions, and bar or bat mitzvahs.

33. Generally, the karaoke operator provides the karaoke services directly to the patrons of the operator's customer—patrons of the bar or restaurant, or attendees of the festival or private event—on behalf of or in conjunction or partnership with the customer.

///

34. Karaoke operators, including the Defendants, are usually compensated by the establishments in which they provide these services, for public shows, or by the organizer, for private events at which they perform.

35. A significant component of the service being provided is access to a catalog of karaoke accompaniment tracks so that singers may select a song with which they are familiar.

36. In order to provide that access, an operator must purchase, license, or otherwise acquire copies of the accompaniment tracks.

37. Those accompaniment tracks may be acquired legitimately by purchasing or licensing original media, or they may be acquired illegitimately by obtaining non-original media from an illicit source.

38. In some cases, operators who have acquired legitimate original media make duplicates of the content of those media to non-original media such as computer hard drives, an activity known as "media-shifting."

39. In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3+G format or another format; this is referred to as "format-shifting."

40. Both media-shifting and format-shifting involve the creation of duplicates of the original materials stored on the compact discs.

41. Slep-Tone authorizes media-shifting and format-shifting with respect to those rights that are under its control (including trademark and trade dress rights and, where applicable, copyright), but not with respect to rights controlled by third parties.

42. The authorization provided as noted in the preceding paragraph requires the would-be media-shifter or format-shifter to meet several criteria.

43. The most important criterion is the requirement to maintain one-to-one correspondence between the operator's original media and the shifted duplicates. One-to-one correspondence means that each duplicate individual karaoke track

stored on a non-original medium is uniquely represented on an original medium that the operator owns and possesses.

44. The operator must also notify Slep-Tone of the desire to shift, and the operator must submit to an audit of shifted content and the operator's original media holdings, for the purpose of verifying compliance with the one-to-one correspondence policy.

45. The failure to obtain authorization from Slep-Tone to conduct a media shift or format shift of its tracks means that the resulting duplicates are unauthorized even if the operator is otherwise in technical compliance with the media-shifting policy.

46. The failure to maintain one-to-one correspondence after receiving authorization from Slep-Tone automatically and immediately voids that authorization.

47. A karaoke operator who acquires or makes unauthorized duplicates of Slep-Tone's karaoke tracks does so without authorization, right, or license, whether or not the duplicates were acquired from an illicit source or the operator made the unauthorized duplicates himself.

48. Upon information and belief, and based upon investigation of their activities, each of the present Defendants is in possession of unauthorized media-shifted and format-shifted duplicates of Slep-Tone's karaoke accompaniment tracks.

49. The Defendants' unauthorized duplicates carry Slep-Tone's federally registered trademarks, Slep-Tone's distinctive trade dress, or both.

50. Each of the Defendants has used media-shifted and/or format-shifted karaoke accompaniment tracks marked with Slep-Tone's registered trademarks and/or distinctive trade dress for commercial purposes—to wit, to provide karaoke entertainment services to or for the benefit of their customers.

/ / /

HARRINGTON LAW, P.C.
Post Office Box 403
Concord, North Carolina 28026
704-315-5800 | fax 704-625-9259

51. Without exception, the Defendants' media-shifting and format-shifting activities (and the commercial services that are enabled by those Defendants' media-shifting and format-shifting activities) have been undertaken without any form of permission or authorization granted by Slep-Tone.

52. An unauthorized duplicate of a karaoke accompaniment track that carries Slep-Tone's marks or trade dress—whether or not that track exists in one-to-one correspondence with a track on an original medium—is a counterfeit.

53. To the consumers of the services provided by KJs using counterfeit materials, particularly those who view the counterfeit materials in a noisy club environment, the counterfeits are in many cases not readily distinguishable from genuine materials despite being degraded in quality through one or many instances of copying.

54. Slep-Tone pays statutory and negotiated royalties to the owners of copyright in the underlying musical works in connection with its activities in legitimately creating, copying, distributing, selling, and licensing original media containing karaoke accompaniment tracks.

55. Because the Defendants have made or obtained counterfeits of the Slep-Tone's accompaniment tracks instead of obtaining original media, the Defendants' commercial use of those tracks is also commercial use of the musical works underlying them—counterfeits and unauthorized uses made without paying royalties to the owners of copyright in those underlying musical works.

56. Slep-Tone spent millions of dollars building and maintaining a recording studio, hiring artists, building distribution facilities, paying royalties and licensing fees, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the most recognizable brands in the karaoke industry.

57. Piracy of the type committed by the Defendants is pervasive and widespread throughout the karaoke industry.

58. Slep-Tone and its licensors have been deprived of millions of dollars of revenue to which they would have rightfully been entitled, and which they would have received, if pirates such as the Defendants had acquired legitimate original media on the scale they have used and are using counterfeit media.

59. Piracy has contributed to the loss of dozens of jobs as Slep-Tone has been forced to curtail its operations, particularly including the production of new material, in the face of increasing piracy rates.

60. A lawfully operating karaoke host who wished to outfit his or her karaoke system with original media containing Slep-Tone's karaoke tracks, to the same extent enjoyed by the Defendants through piracy, would find it necessary to spend thousands upon thousands of dollars to acquire that material—assuming, of course, that it could even be acquired, since many tracks are no longer available in the primary market.

61. Because the Defendants do not experience this cost, they enjoy an artificially low overhead—an unfair advantage over legitimate operators based upon lower per-show costs.

62. The Defendants' use of piracy also enables them to obtain significantly more tracks that a lawfully operating karaoke host can obtain, because the Defendants do not have to pay premium prices for rare tracks on the secondary market.

63. The Defendants therefore find it easier to turn a profit or to charge lower fees to the bars and restaurants who consume their services, than would an otherwise similarly situated but lawful KJ.

64. The market conditions the Defendants have created tend to reward piracy by increasing pirates' profits; to punish lawful conduct by exerting unfair downward pressure on the fees paid to legitimate hosts by venues; to encourage the proliferation of piracy as formerly legitimate hosts turn to piracy simply to

///

- 9 -
**COMPLAINT**

1  compete; and to deprive Slep-Tone of the sustaining revenue necessary to ensure
2  continued operations.

3  65.   Because of piracy, it is nearly impossible for non-pirate operators to
4  compete against pirate operators, who are able to provide less expensive karaoke
5  services and a greater number of tracks due to their lower overhead costs.

6  66.   Even when pirate operators have been forced through legal action or
7  agreement to destroy their counterfeit duplicates of Slep-Tone's tracks, the pirate
8  operators continue to engage in unfair competition using pirated materials
9  belonging to other manufacturers.

10  67.   This unfair competition harms Slep-Tone, despite the elimination of
11  counterfeit duplicates of its tracks, because the continuing piracy of other
12  manufacturers' tracks exerts pressure upon Slep-Tone's customers and potential
13  customers to commit piracy of Slep-Tone's tracks.

## THE RIGHTS OF THE PLAINTIFF

68.   Plaintiff Slep-Tone is the owner of U.S. Trademark Registrations No. 1,923,448 and No. 4,099,045, both for the trademark SOUND CHOICE.

69.   Plaintiff Slep-Tone is also the owner of U.S. Trademark Registrations No. 2,000,725 and No. 4,099,052, both for a display trademark as follows:



70.   Slep-Tone has, for the entire time its marks ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

/ / /

71. Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Sound Choice Trade Dress"). This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the Sound Choice Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

72. Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

73. The individual and collected elements of the Sound Choice Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

74. The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress, whether or not the Sound Choice Marks are also displayed.

75. The elements of the Trade Dress represent specific design choices by the Plaintiff; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

76. No competitor of Slep-Tone is required to use any element of the Sound Choice Trade Dress to accomplish the cueing function, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the cueing function.

///

///

///

## ACTIVITIES OF THE DEFENDANTS

77. Each of the Defendants has possessed, used, and displayed unauthorized counterfeit goods bearing the Sound Choice Marks, or the Sound Choice Trade Dress, or both.

78. Each of the Defendants has knowingly benefited from the possession, use, and display of unauthorized counterfeit goods bearing the Sound Choice Marks and the Sound Choice Trade Dress.

79. Each of the Defendants has provided services in connection with the Sound Choice Marks, the Trade Dress, or both, without authorization or tolerance from—or indeed notice to—Slep-Tone.

80. Each of the Defendants has advertised, or benefited from the advertising of others of, the Defendant's provision of or availability to provide karaoke services, in connection with which the Sound Choice Marks, the Sound Choice Trade Dress, or both have been used.

81. The activities of each Defendant are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months or years, depending upon when the activity was commenced, and repeated on each occasion on which the Defendant provided karaoke entertainment services.

82. Each of the Defendants' acts of infringement are of a commercial nature, in that they engaged in the acts with the transfer of money or other things of value from one party to another as a significant motivation for providing the services.

83. None of the Defendants have submitted to and passed an audit of their karaoke systems for the purposes of verifying their compliance with Slep-Tone's media-shifting policy, a necessary condition for compliance with those policies.

84. Upon information and belief, the Defendants' piracy of accompaniment tracks is not limited to Slep-Tone's tracks.

85. Each of the Defendants has committed acts of piracy of other manufacturers' accompaniment tracks, utilizing the words, names, symbols, and other devices associated with those manufacturers, upon information and belief without authorization.

86. Each of the Defendants knew, or should have known under the circumstances, that they were obtaining and using counterfeit karaoke tracks.

## DAMAGES

87. The Defendants' unauthorized use of the Slep-Tone's trademarks and trade dress has damaged Slep-Tone.

88. Individually, each of the Defendants has damaged Slep-Tone in an amount of at least $25,000, and perhaps as much as $50,000 or more, for each karaoke system the Defendant operates. This figure is based upon the estimated minimum cost of acquiring, through legitimate means, a single set of copies of Slep-Tone's materials that each of the Defendants has pirated.

89. Upon information and belief, in the aggregate, by exerting illegitimate and unfair pressure upon the market for karaoke services in this area through the use of pirated material belonging to Slep-Tone and to other manufacturers, the Defendants have jointly cost Slep-Tone in excess of $500,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

## FIRST CLAIM FOR RELIEF
## TRADEMARK AND/OR TRADE DRESS INFRINGEMENT

90. Each of the Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or of the Sound Choice Trade Dress, or both, in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or of the Sound Choice Trade

Dress, or both, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or of the Sound Choice Trade Dress, or both, during the provision of those services.

91. The Defendants' use of the Sound Choice Marks or of the Sound Choice Trade Dress, or both, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

92. Plaintiff Slep-Tone did not license any of the Defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Sound Choice Trade Dress, or both, in connection with the provision of their services.

93. The Defendants' use of the Sound Choice Marks, the Sound Choice Trade Dress, or both is likely to cause confusion, or to cause mistake, or to deceive the Defendants' customers and patrons into believing that the Defendants' services are being provided with the authorization of Slep-Tone and that the Defendants' music libraries contain bona fide Sound Choice accompaniment tracks.

94. The acts of each of the Defendants were willful, knowing, and intentional.

95. Slep-Tone has been damaged by infringing activities of each of the Defendants.

96. Unless enjoined by the Court, the Defendants' infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

97. On each occasion when they caused a Slep-Tone accompaniment track to be played during a karaoke show, the Defendants displayed the Sound Choice Marks, the Sound Choice Trade Dress, or both in connection with the Defendants' karaoke services.

98. The display of the Sound Choice Marks, the Sound Choice Trade Dress, or both is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved the Defendants' services and commercial activities.

99. The display of the Sound Choice Marks or the Sound Choice Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by the Defendants.

100. The Defendants' use of Slep-Tone's marks, trade dress, or both in this fashion or in a more appropriate fashion would have inured to the benefit of Slep-Tone if the Defendants had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

101. Because Slep-Tone has been denied this revenue, it has been damaged by the Defendants' uses.

102. On each occasion when they caused an accompaniment track pirated from a manufacturer other than Slep-Tone to be played during a karaoke show, the Defendants displayed the words, names, and symbols of the other manufacturer in connection with the Defendants' karaoke services.

103. Upon information and belief, the Defendants' use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact the pirated copy was made or acquired by the Defendant.

104. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated

///

HARRINGTON LAW, P.C.
Post Office Box 403
Concord, North Carolina 28026
704-315-5800 | fax 704-625-9259

1  tracks are legitimate, authorized, and authentic materials that the Defendant
2  acquired in a legitimate manner.

3   105.   The display of the false designations of origin is also likely to cause
4  confusion, or to cause mistake, or to deceive those present during the display, in
5  that those present are likely to be deceived into believing, falsely, that the works
6  being performed were sold by those manufacturers and purchased by the
7  Defendants.

8   106.   The Defendants' use of the false designations of origin in this fashion
9  damages Slep-Tone by enabling the Defendants to provide karaoke services at a
10 lower cost than persons who acquire those materials legitimately, including Slep-
11 Tone's legitimate customers.

12  107.   The consequential denial of revenue from a legitimate market for Slep-
13 Tone's customers' services prevents Slep-Tone's customers from making purchases
14 of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

15  108.   Because Slep-Tone has been denied this revenue, it has been damaged
16 by the Defendants' false designations of origin relating to other manufacturers.

17  109.   Unless enjoined by the Court, the Defendants' unfair competition
18 activities as described above will continue unabated and will continue to cause
19 harm to Slep-Tone.

20

21                        **PRAYER FOR RELIEF**

22      WHEREFORE, Plaintiff Slep-Tone prays for judgment against each of the
23 Defendants, and that the Court:

24      A.   Find that each of the Defendants has committed acts of infringement,
25 including but not limited to counterfeiting, of the federally registered Sound Choice
26 Marks, of the Sound Choice Trade Dress, or of both;

27      B.   Find that each of the Defendants has engaged in unfair competition
28 detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C.   Enter judgment against each of the Defendants and in favor of Slep-Tone on all applicable counts;

D.   Find the that Defendants' activities were in all respects conducted willfully and for profit;

E.   Award to Slep-Tone the Defendants' profits and the damages sustained by Slep-Tone because of the Defendants' conduct in infringing the Sound Choice Marks, the Sound Choice Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $25,000 for each karaoke system operated by the Defendants;

F.   Award to Slep-Tone the Defendants' profits and the damages sustained by Slep-Tone because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), in an amount not less than $500,000, jointly and severally based upon the collective conduct of the Defendants;

G.   Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

H.   Order all computer disks, drives, or other media belonging to any of the Defendants, which media contain counterfeits of Slep-Tone's marks or trade dress, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.   Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of their respective marks and trade dress by the Defendants;

J.   Grant Slep-Tone preliminary and permanent injunctive relief against further false designations of origin by the Defendants with respect to words, names, and symbols associated with other manufacturers;

K.   Award Slep-Tone its costs of suit and attorney's fees, to the extent not awarded above; and

L.   Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this the 30th day of November, 2012.

**HARRINGTON LAW, P.C.**

BY: /s/ James M. Harrington
James M. Harrington
P.O. Box 403
Concord, NC 28026-0403
(704) 315-5800

Attorney for Plaintiff
SLEP-TONE ENTERTAINMENT
CORPORATION